UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MOHAMED YAHYA BOUTTA,

                Petitioner,

v.

KEVIN RAYCRAFT et al.,

                Respondents.

_____/

Case No. 1:25-cv-1559

Honorable Jane M. Beckering

## OPINION

Petitioner Mohamed Yahya Boutta initiated this action on November 24, 2025, by filing a counseled combined petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 and complaint for declaratory and injunctive relief. (Pet., ECF No. 1.) A day later, Petitioner filed an amended counseled petition and complaint. (Am. Pet., ECF No. 3.) Petitioner is a United States Immigration and Customs Enforcement (ICE) detainee currently detained at the North Lake Processing Center located in Baldwin, Lake County, Michigan.

Petitioner challenges the lawfulness of his current detention and asks the Court for the following relief: to accept jurisdiction over this action; to declare that Petitioner's warrantless arrest and detention without an individualized determination violates the Due Process Clause of the Fifth Amendment; issue a writ of habeas corpus ordering Respondents to immediately release Petitioner; to prohibit Respondents from transferring Petitioner from the Western District of Michigan without the Court's approval; and, to award attorneys' fees and costs for this action. (*Id.*,

PageID.51.)[1] For the following reasons, the Court will conditionally grant Petitioner's amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.

## Discussion

### I.    Factual Background

Petitioner is a native and citizen of Mauritania. (Notice to Appear, ECF No. 3-2, PageID.55.) He entered the United States on or about July 12, 2023, near Lukeville, Arizona. (*Id.*) On that date, United States Border Patrol (USBP) encountered and arrested Petitioner. (Hoppe Decl. ¶ 5, ECF No. 5-1, PageID.88.) On July 13, 2023, USBP agents issued Petitioner a Form I-200, Warrant of Arrest, and the I-862, NTA, charging Petitioner with inadmissibility pursuant to § 212(a)(6)(A)(i) of the Immigration and Nationality Act (INA) because Petitioner is a noncitizen "present in the United States at any time or place other than as designated by the Attorney General." (*Id.* ¶ 6, PageID.88–89; *see also* NTA, ECF No. 3-2, PageID.55.) USBP released Petitioner pursuant to an Order of Release on Recognizance. (Order of Release, ECF No. 3-1, PageID.54.) The Order of Release on Recognizance indicated that Petitioner was released pursuant to § 236 of the INA (codified at 8 U.S.C. § 1226), provided that he complied with the conditions set forth therein. (*Id.*)

---

[1] In his petition, Petitioner sought either an initial temporary restraining order preventing his transfer from the Western District of Michigan and compelling his release or compelling Respondents to provide a bond hearing to ensure Petitioner's due process rights, or alternatively, Petitioner asked the Court to order Respondents to show cause, within three business days, why the petition should not be granted. (Am. Pet., ECF No. 3, PageID.37.) In an Order entered on November 25, 2025, the Court directed Respondents to show cause, within three business days, why the writ of habeas corpus and other relief requested by Petitioner should not be granted. (Order, ECF No. 4.) Respondents filed their response on December 1, 2025 (ECF No. 5), and Petitioner filed his reply on December 4, 2025 (ECF No. 6). As to Petitioner's request for a temporary restraining order, because the Court will conditionally grant Petitioner's § 2241 petition, as set forth herein, the Court does not, and need not, separately address Petitioner's request for a temporary restraining order.

Petitioner subsequently "attempted to file his application for asylum, withholding of removal[,] and relief under the Convention Against Torture with the immigration court." (Am. Pet., ECF No. 3, PageID.34.) However, "the immigration court would not accept his application for asylum" because, Petitioner avers, the NTA was never filed with the immigration court. (*Id.*) Respondents acknowledge that the "NTA was later dismissed because it was not filed with an immigration court." (Hoppe Decl. ¶ 6, ECF No. 5-1, PageID.89.)

In September of 2023, Petitioner filed his asylum application with the United States Citizenship and Immigration Services. (Am. Pet., ECF No. 3, PageID.34; *see also* ECF No. 3-3, PageID.56.) Petitioner represents that the application is still pending. (Am. Pet., ECF No. 3, PageID.34.) Moreover, Petitioner received an I-766, Employment Authorization Document, which is valid from March 30, 2024 through March 29, 2029. (Am. Pet., ECF No. 3, PageID.34; *see also* ECF No. 3-4, PageID.57.)

ICE Enforcement and Removal Operations (ERO) agents encountered Petitioner on September 21, 2025, near Commerce Township, Michigan. (Hoppe Decl. ¶ 7, ECF No. 5-1, PageID.89.) Agents arrested Petitioner and issued him Form I-860, Notice and Order of Expedited Removal under the "2004 Designation." (*Id.*) Respondents aver that

> [t]he 2004 Expedited Removal Designation is an alternative form of removal that is available when an alien is applying for admission to the United States as defined by section 235(a)(1) of the Act, who was encountered by an immigration officer within 100 airmiles of the U.S. international border; and failed to establish to the satisfaction of an immigration officer that they have been physically present in the U.S. for the fourteen days immediately prior to the date of encounter. 69 Fed. Reg. 48877 (Aug. 11, 2004).

(*Id.*) ICE detained Petitioner without bond under § 235 of the INA on the basis that Petitioner "is an applicant for admission to the United States seeking admission and he is not clearly and beyond doubt entitled to admission." (*Id.* ¶ 8, PageID.90.)

While in custody, Petitioner expressed a fear of returning to Mauritania. (*Id.* ¶ 9.) On November 24, 2025, an asylum officer conducted a credible fear interview with Petitioner. (*Id.* ¶ 10.) The officer concluded that Petitioner "did not have a credible fear of return to Mauritania." (*Id.*) Petitioner requested that an immigration judge review that decision. (*Id.*) An immigration judge did so the following day and "vacated the decision of the asylum officer[,] finding [that Petitioner] has a credible fear of return to Mauritania, thereby requiring [Petitioner] be placed in removal proceedings." (*Id.* ¶ 11.)

On November 26, 2025, ICE served Petitioner with a second NTA. (*Id.* ¶ 12.) That NTA charged Petitioner with inadmissibility pursuant to § 212(a)(6)(A)(i) of the INA as a noncitizen "present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General." (*Id.*, PageID.90–91.) Petitioner was also charged with inadmissibility under § 212(a)(7)(A)(i)(I) of the INA

> as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality as required under the regulations issued by the Attorney General under section 211(a) of the Act.

(*Id.*, PageID.91.) Respondents aver that "[t]he signed NTA is awaiting return from . . . North Lake . . . and will be filed with the Detroit Immigration Court." (*Id.* ¶ 13.) "Once filed, [Petitioner] will be placed in removal proceedings on the detained docket before the Detroit Immigration Court and an initial master calendar hearing will be scheduled." (*Id.*) Petitioner has not requested a bond hearing. (*Id.*)

## II.   Habeas Corpus Legal Standard

The Constitution guarantees that the writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art I, § 9, cl. 2). Section 2241 of Title 28 confers the federal courts with the power to issue

writs of habeas corpus to persons "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241. This includes challenges by non-citizens in immigration-related matters. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *see also A. A. R. P. v. Trump*, 145 S. Ct. 1364, 1367 (2025).

### III.    Exhaustion

Respondents argue that the Court should deny Petitioner's request for habeas corpus relief because Petitioner has not requested a bond hearing before the immigration court and, therefore, has not exhausted his administrative remedies. (Resp., ECF No. 5, PageID.68.) Respondents further argue that Petitioner should request a bond hearing and, if necessary, appeal any unfavorable decision to the Board of Immigration Appeals (BIA). (*Id.*)

Here, no applicable statute or rule mandates administrative exhaustion by Petitioner. Thus, whether to require exhaustion is within this Court's "sound judicial discretion." *See Shearson v. Holder*, 725 F.3d 588, 593–94 (6th Cir. 2013) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)). "Courts have described an implied requirement to raise issues with an agency as a 'judge-made,' 'prudential,' or 'common law' duty to exhaust," *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 746 (6th Cir. 2019) (citations omitted), and such a court-made exhaustion rule must comply with statutory schemes and Congressional intent, *Shearson*, 725 F.3d at 593–94. Notably, the United States Court of Appeals for the Sixth Circuit has not yet decided "whether courts should impose administrative exhaustion in the context of a noncitizen's habeas petition for unlawful mandatory detention," *Pizarro Reyes v. Raycraft*, No. 25-cv-12546, 2025 WL 2609425, at *3 (E.D. Mich. Sep. 9, 2025) (citing *Hernandez Torrealba v. U.S. Dep't of Homeland Sec.*, No. 1:25-cv-1621, 2025 WL 2444114, at *8 (N.D. Ohio Aug. 25, 2025)), and "[t]he Sixth Circuit has not formally adopted a standard for determining when prudential exhaustion applies." *Lopez-Campos v. Raycraft*, No. 2:25-cv-12486, 2025 WL 2496379, at *4 (E.D. Mich. Aug. 29, 2025). However,

courts within the Sixth Circuit "have applied the three-factor test, set forth in *United States v. California Care Corp.*, 709 F.2d 1241, 1248 (9th Cir. 1983) (derived from *McGee v. United States*, 402 U.S. 479, 484[ (1971)]; !*McKart v. United States*, 395 U.S. 185, 193–95[ (1969)),]" to determine whether prudential exhaustion should be required. *Id.* Under this three-factor test,

> Courts may require prudential exhaustion when:
>
> (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision;
>
> (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and
>
> (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review.

*Id.* (citing *Shweika v. Dep't of Homeland Sec.*, No. 1:06-cv-11781, 2015 WL 6541689, at *12 (E.D. Mich. Oct. 29, 2015)).

Upon consideration of these factors, this Court concludes that prudential exhaustion should not be required in Petitioner's case. First, the central question presented by Petitioner's § 2241 petition is whether 8 U.S.C. § 1225 or 8 U.S.C. § 1226 applies to Petitioner. That determination is principally a legal question of statutory interpretation and does not require the record that would be developed if the Court required Petitioner to exhaust his administrative remedies. Moreover, this Court is not bound by, and is not required to give deference to, any agency interpretation of a statute. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) (discussing that "courts need not and under the [Administrative Procedure Act (APA)] may not defer to an agency interpretation of the law simply because a statute is ambiguous").

Second, Petitioner's constitutional challenge to his detention does not require exhaustion. The Sixth Circuit has noted that due process challenges, such as the one raised by Petitioner, which are not premised on "correctable procedural errors," generally do not require exhaustion because

the BIA cannot review constitutional challenges. *See Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006) (discussing that "an alien's due process challenge generally does not require exhaustion," but noting that an "alien must raise correctable procedural errors," such as a claim "that the BIA denied him due process by relying upon an 'incomplete and inaccurate' transcript to review his case," "to the BIA"). Finally, it is doubtful that BIA review of Petitioner's custody would preclude the need for judicial review. The Court reaches that conclusion based upon the fact that the Government has clearly set forth its belief that § 1225(b)(1)(A) applies to all noncitizens who have resided within the United States prior to their arrest and detention. Notably, the BIA recently proclaimed that any individual who has ever entered the United States unlawfully and was later detained is no longer eligible for bond and is subject to mandatory detention under § 1225(b)(2)(A). *See Matter of Yajure Hurtado*, 29 I&N Dec. 216, 229 (BIA 2025). It is simply unlikely that any administrative review by the BIA of that denial would lead the Government to change its position, and thereby obviate the need for judicial review of Petitioner's § 2241 petition. Accordingly, for the foregoing reasons, this Court concludes that prudential exhaustion is not required.

Alternatively, even in situations where a court may ordinarily apply prudential exhaustion, the court may still choose to waive exhaustion. *See Lopez-Campos*, 2025 WL 2496379, at *4 (citations omitted). A court may choose to rule upon the merits of the issues presented when the "legal question is 'fit' for resolution and delay means hardship." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000) (citation omitted). A court may also waive exhaustion if the "pursuit of administrative remedies would be a futile gesture." *Shearson*, 725 F.3d at 594 (citation omitted).

Here, given the Government's position and the BIA's recent decision in *Yajure Hurtado*, requiring Petitioner to exhaust his administrative remedies and request a bond hearing would likely be futile. Moreover, it is clear that delay would result in hardship to Petitioner. There is no evidence in the record as to how long Petitioner would have to wait for a bond hearing to be scheduled. Petitioner's request would likely be denied given the BIA's recent decision in *Yajure Hurtado*. Then, Petitioner would have the opportunity to appeal any unfavorable decision to the BIA. Appeals of bond denials "typically take six months or more to be resolved at the BIA." *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1245 (W.D. Wash. 2025) (citation omitted). It is "unmistakable that . . . depriving [Petitioner] of his liberty while awaiting a BIA appeal decision certainly equates to hardship. And any delay results in the very harm [Petitioner] is trying to avoid . . . – detention." *See Lopez-Campos*, 2025 WL 2496379, at *5.

In sum, the Court declines to enforce the doctrine of prudential exhaustion against Petitioner. Moreover, even if the Court were to conclude that exhaustion is warranted, the Court concludes in the alternative that waiver of exhaustion is appropriate. Accordingly, the Court will proceed to address the merits of Petitioner's § 2241 petition.

## IV.    Merits Discussion

### A.    Expedited Removal

Respondents contend that Petitioner is subject to expedited removal proceedings pursuant to 8 U.S.C. § 1225(b)(1), and that because Petitioner is subject to expedited removal proceedings, this Court lacks jurisdiction over Petitioner's claims challenging his detention. (Resp., ECF No. 5, PageID.71–74.) For the reasons set forth below, the Court disagrees with Respondents' jurisdictional argument.

Recently, the United States District Court for the District of Columbia set forth the following detailed explanation contrasting standard removal proceedings to expedited removal proceedings:

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA or the Act), Congress established two main processes for removing noncitizens deemed ineligible to enter or remain in the United States. *See* IIRIRA, Pub. L. 104-208, 110 Stat. 3009, div. C (1996). The first, commonly referred to as "section 240" proceedings due to the section of the Act in which it appears, is the standard mechanism for removing inadmissible noncitizens. Section 240 removal proceedings take place before an immigration judge (IJ), an employee of the Department of Justice who must be a licensed attorney and has a duty to develop the record in cases before them. 8 U.S.C. § 1229a(a)(1), (b)(1); 8 C.F.R. § 1003.10(a). They are adversarial proceedings in which the noncitizen has the right to hire counsel, examine and present evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). Section 240 proceedings typically take place over the course of multiple hearings. *See CHIR*, ⸻ F. Supp. 3d at ⸻, 2025 WL 2192986, at *3. This allows time for individuals to gather and present evidence in support of petitions for relief available in immigration court (like asylum) and to seek collateral relief from other components of the Department of Homeland Security (like adjustment of status on the basis of marriage or family). *See* 8 U.S.C. §§ 1229a(b)(4)(B), (c)(4), 1229b. After an IJ renders a decision, either party may appeal to the Board of Immigration Appeals. 8 C.F.R. §§ 1240.15, 1003.1. If the Board upholds a removal order, the noncitizen can appeal that decision to a federal court of appeals. 8 U.S.C. § 1252. The Congress that passed IIRIRA referred to the new section 240 as a "streamline[d]" removal process relative to what came before it because, among other things, it removed a layer of appellate review. H.R. Rep. 104-469(I), 12, 107–08 (1996).

Still, IIRIRA included a second, even more streamlined, form of proceeding applicable only to certain noncitizens: expedited removal. Relative to section 240 removal, "[e]xpedited removal lives up to its name." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020). In expedited removal, an immigration officer, not an IJ, conducts the initial fact-finding. 8 C.F.R. § 235.3(b)(2)(i). The immigration officer asks a short series of questions to determine (a) the individual's "identity, alienage, and inadmissibility," and (b) whether they intend to apply for asylum, fear persecution or torture, or fear returning to their country of origin. *Id.* § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this questioning. *See United States v. Guzman*, 998 F.3d 562, 567 (4th Cir. 2021) ("[I]t is undisputed that the text of the INA's expedited removal procedure does not require that the alien be advised of a right to counsel or be accommodated in an effort to obtain counsel."). If the noncitizen is inadmissible and does not indicate that they intend to apply for asylum or fear persecution, the inspecting officer issues a Notice and Order of Expedited Removal, and the noncitizen may respond in a sworn statement. 8 C.F.R.§ 235.3(b)(2)(i). Once a supervising officer reviews and

signs off on the inspecting officer's determination, the noncitizen is ordered removed. *See id.* The noncitizen has no right to appeal that decision to an IJ, the Board of Immigration Appeals, or (with one exception discussed below) any court. *Id.* § 235.3(b)(2)(ii); 8 U.S.C. § 1252(a)(2)(A)(i).

*Make the Road New York v. Noem*, --- F. Supp. 3d ----, No. , 2025 WL 2494908, at *2–3 (D.D.C.

Aug. 29, 2025) (footnote omitted). The District of Columbia also stated:

> "The process is scarcely more involved" if the noncitizen "assert[s] an intention to apply for asylum or a fear of persecution." *Make the Rd.*, 962 F.3d at 619. If the noncitizen so indicates, the inspecting officer must refer them for a "credible fear interview," to be conducted by an asylum officer. 8 C.F.R. § 235.3(b)(4). If that asylum officer finds the noncitizen to have a credible fear of persecution, the noncitizen will be moved either to full section 240 removal proceedings or to administrative asylum proceedings. *Id.* § 208.30(f). If, however, the officer makes a negative credible fear determination, a supervisor will review the determination. *Id.* § 208.30(e)(8). If the supervisor agrees with the negative determination, the noncitizen can then request review by an IJ. 8 U.S.C. § 1225(b)(1)(B)(iii)(III). The IJ's review "is meant to conclude within 24 hours" and is final. *Make the Rd.*, 962 F.3d at 619. With narrow exceptions discussed below, no further administrative or judicial review is available. *Id.*
>
> . . .
>
> The expedited removal regulations provide a few additional avenues for noncitizens to prove that they are not in fact eligible for expedited removal. During the initial interview with an immigration officer, a noncitizen may "claim[ ] to have been lawfully admitted for permanent residence, admitted as a refugee under section 207 of the Act, granted asylum under section 208 of the Act, or claim[ ] to be a U.S. citizen." 8 C.F.R. § 235.3(b)(5)(i). If the immigration officer can verify any of those claims, the (alleged) noncitizen will not be removed. *Id.* § 235.3(b)(5)(ii)–(iv). If the immigration officer cannot verify the claim, but the (alleged) noncitizen makes the claim under penalty of perjury, the case is referred for review by an immigration judge. *Id.* § 235.3(b)(5)(iv). In addition, the regulations permit the noncitizen to "establish that he or she was admitted or paroled into the United States." *Id.* § 235.3(b)(6). The noncitizen must be given "a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection at a port-of-entry." *Id.* "If the alien establishes that he or she was lawfully admitted or paroled," the regulation continues, the agency reviews whether the noncitizen's parole "has been, or should be, terminated." *Id.* If the noncitizen cannot establish that they were "lawfully admitted or paroled," they "will be ordered removed pursuant to" the expedited removal provision. *Id.*

*Id.* at *3–4.

Notably, prior to 2025, expedited removal was limited "only to 'arriving aliens.'" *See id.* at *4 (citing Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312-01, 10313 (Mar. 6, 1997)). Thus, prior to 2025, "the only people eligible for expedited removal [were] (1) 'arriving aliens,' (2) those who arrived by sea within the last two years, and (3) those apprehended within 100 miles of the border and 14 days of entry." *Id.* at *5. However, in January of 2025, the Department of Homeland Security issued "Designating Aliens for Expedited Removal," 90 Fed. Reg. 8139 (Jan. 24, 2025). *See Make the Road New York*, 2025 WL 2494908, at *5. Under that designation,

> DHS asserts the authority to apply expedited removal to noncitizens "who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years." *Id.* In supplementing the previous designations that remained in effect with the 2025 Designation, DHS has applied expedited removal to the maximum extent permitted by section 1255(b)(1)(A). This is a significant change: Aside from a brief window in 2019, expedited removal has always been limited to (at the most) those arriving by sea, or those within 100 miles of the border who had not been in the country for more than 14 days. *See CHIR*, —— F. Supp. 3d at —— & n.9, 2025 WL 2192986, at *6 & n.9.

*Id.* (footnote removed).

As an initial matter, in his petition, Petitioner suggests that "Respondents erred procedurally in placing [him] in 'expedited removal' more than two years later and after clearly paroling him pursuant to Section 1226(a)." (Am. Pet., ECF No. 3, PageID.41.) Respondents aver that the fact that "ICE placed Petitioner in expedited removal hearings after initially placing him in section 240 proceedings is not determinative." (Resp., ECF No. 5, PageID.72.) However, Respondents' own declaration clearly indicates that the NTA issued to Petitioner in 2023, when Petitioner was released on the Order of Release on Recognizance, "was later dismissed because it was not filed with an immigration court." (Hoppe Decl. ¶ 6, ECF No. 5-1, PageID.89.) In light of

11

that dismissal, it does not appear that ICE initiated removal proceedings against Petitioner until approximately two years later, in September of 2025, when agents encountered Petitioner in Michigan. Likewise, Respondents' own declaration suggests that even though Petitioner was initially issued a Form I-860, Notice and Order of Expedited Removal, upon his arrest, Petitioner has now been moved to full section 240 removal proceedings in light of the fact that an immigration judge concluded that Petitioner "has a credible fear of return to Mauritania[,] thereby requiring [Petitioner] be placed in removal proceedings." (Hoppe Decl. ¶ 7, 11, PageID.89–90.)

In any event, the Court need not conclusively determine whether Petitioner is subject to expedited or standard removal proceedings in order to reject Respondents' argument concerning jurisdiction. According to Respondents, "[t]he plain language of the INA divests federal courts of subject matter jurisdiction to consider any claims 'arising from' or 'relating to' the expected removal process." (Resp., ECF No. 5, PageID.73 (citing 8 U.S.C. § 1252(a)(2)(A)(i).) That section provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—
>
> **(i)** except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title.

*See* 8 U.S.C. § 1252(a)(2)(A)(i). Subsection (e) provides:

> Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of--
>
> **(A)** whether the petitioner is an alien,
>
> **(B)** whether the petitioner was ordered removed under such section, and
>
> **(C)** whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been

12

> granted asylum under section 1158 of this title, such status not having been
> terminated, and is entitled to such further inquiry as prescribed by the
> Attorney General pursuant to section 1225(b)(1)(C) of this title.

*See* 8 U.S.C. § 1252(e)(2).

According to Respondents, "the jurisdiction-stripping provisions of § 1252(a) and (e)(2)
bar the Court's consideration of [Petitioner's] petition" because Petitioner is "not challeng[ing]
ICE's determination that he is an alien, or whether he was removed, or whether he has been
lawfully admitted for permanent residence, admitted as a refugee, or granted asylum." (Resp., ECF
No. 5, PageID.74.) Petitioner avers that "holding a challenge to *detention* as inherently implicating
a challenge to *removal* would lead to 'absurd' results." (Pet., ECF No. 1, PageID.11.) Petitioner
also suggests that this Court may exercise jurisdiction pursuant to the Constitution's Suspension
Clause. (*Id.*, PageID.4.)

The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall
not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."
*See* U.S. Const. Art. I, sec. 9, cl. 2. The Suspension Clause reflects a belief by the Framers that
they "considered the writ a vital instrument for the protection of individual liberty[.]" *Boumediene*
*v. Bush*, 553 U.S. 723, 743 (2008). It ensures "the Judiciary will have a time-tested device, the
writ, to maintain the delicate balance of governance that is itself the surest safeguard of liberty"
and "protects the rights of the detained by affirming the duty and authority of the Judiciary to call
the jailer to account." *Id.* at 745 (internal quotation marks removed).

With respect to the reach of the Suspension Clause, the United States District Court for the
District of Oregon recently stated:

> The Supreme Court in *Boumediene v. Bush* provided three factors for district courts
> to consider when "determining the reach of the Suspension Clause." Those factors
> are: "(1) the citizenship and status of the detainee and the adequacy of the process
> through which that status determination was made; (2) the nature of the sites where
> apprehension and then detention took place; and (3) the practical obstacles inherent

in resolving the prisoner's entitlement to the writ." For the first factor, courts compare the process that a detainee has actually been afforded with the "procedures and adversarial mechanisms that would eliminate the need for habeas corpus review." At the second factor, that the apprehension and detention took place within the United States weighs in favor of finding rights under the Suspension Clause. And with respect to the third factor, if government objectives—such as military missions or international relationships—will be compromised if habeas corpus courts had jurisdiction to hear the detainees' claims, that may weigh against application of the Suspension Clause.

*Y-Z-L-H v. Bostock*, 792 F. Supp. 3d 1123, 1141 (D. Or. 2025) (footnotes omitted).

Upon consideration of the three *Boumediene* factors, the Court concludes that the Suspension Clause applies here. Petitioner is a noncitizen who was released on an Order of Release on Recognizance, has lived in the United States for nearly two years, and has been granted employment authorization. Moreover, in his petition, Petitioner is not challenging his right to remain in the United States, but "merely seeks release from custody—the traditional purpose of the habeas writ." *See id.* at 1142. Petitioner was apprehended and detained within the United States. Moreover, Respondents do not suggest that any government objectives would be compromised if this Court exercised habeas corpus jurisdiction over Petitioner's petition.

For the foregoing reasons, the Court concludes that even if § 1252(a)(2)(A)(i) and (e)(2) precluded this Court from reviewing Respondents' decision to detain Petitioner, the Court may exercise jurisdiction over Petitioner's challenge to his detention pursuant to the Suspension Clause.[2]

---

[2] This conclusion accords with other courts that have considered the *Boumediene* factors in actions challenging detention by those subject to expedited removal proceedings. *See, e.g.*, *Alfonso Perez v. Mordant*, No. 2:25-cv-00947-SPC-DNF, 2025 WL 3466956, at *3 (M.D. Fla. Dec. 3, 2025); *Noori v. Larose*, No. 25-cv-3006-BAS-MMP, 2025 WL 3295386, at *2–3 (S.D. Cal. Nov. 26, 2025); *Y-Z-L-H*, 792 F. Supp. 3d at 1141–43. This Court has not located, and the parties have not identified, any case law declining to exercise jurisdiction under the Suspension Clause to habeas corpus actions involving similar facts and procedural postures.

### B.    Statutory Basis for Petitioner's Detention

Petitioner contends that Respondents have violated the INA by concluding that Petitioner

is detained pursuant to the mandatory detention provisions set forth in 8 U.S.C. § 1225(b)(2). (*See*

Am. Pet., ECF No. 3, PageID.50–51.) Respondents, however, contend that Petitioner meets every

element for detention under § 1225(b)(2), and that

> [u]nder the plain language of § 1225(b)(2), DHS is required to detain all aliens, like
> Petitioner, who are present in the United States without admission and are subject
> to removal proceedings—regardless of how long the alien has been in the United
> States or how far from the border they ventured.

(Resp., ECF No. 5, PageID.77.)

Section 1225(b)(2)(A) provides that "in the case of an alien who is an applicant for

admission, if the examining immigration officer determines that an alien seeking admission is not

clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding

under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). And, § 1226(a) states:

> On a warrant issued by the Attorney General, an alien may be arrested and detained
> pending a decision on whether the alien is to be removed from the United States.
> Except as provided in subsection (c)[3] and pending such decision, the Attorney
> General—
>
> (1) may continue to detain the arrested alien; and
>
> (2) may release the alien on—
>
> > (A) bond of at least $1,500 with security approved by,
> > and containing conditions prescribed by, the Attorney
> > General; or
> >
> > (B) conditional parole . . . .

---

[3] Subsection (c) refers to the "[d]etention of criminal aliens," which does not apply here. *See*
8 U.S.C. § 1226(c). The parties do not contend that Petitioner has been convicted of any crime
listed under 8 U.S.C. § 1227(a)(2)(A).

*Id.* § 1226(a). The plain language of these provisions indicates that both § 1225 and § 1226 govern the detention of noncitizens pending removal proceedings. The difference is that § 1225 provides for mandatory detention and § 1226 allows for the release of the noncitizen on conditional parole or bond. As explained below, the Court concludes that § 1226(a), not § 1225(b)(2)(A), governs Petitioner's detention.

"A statute should be construed so that effect is given to all its provisions." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citation omitted); *see Corley v. United States*, 556 U.S. 303, 314 (2009); *see also Kentucky v. Biden*, 23 F.4th 585, 603 (6th Cir. 2022) (noting that courts "must give effect to the clear meaning of statutes as written" (citation omitted)). "When interpreting a statute, the inquiry 'begins with the statutory text, and ends there as well if the text is unambiguous.'" *See In re Vill. Apothecary, Inc.*, 45 F.4th 940, 947 (6th Cir. 2022) (citation omitted). But, "the 'meaning— or ambiguity—of certain words or phrases may only become evident when placed in context.'" *King v. Burwell*, 576 U.S. 473, 486 (2015) (citation omitted). And, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (citation omitted). The Court must also "use every tool at [its] disposal to determine the best reading of the statute." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024).

As set forth above, § 1225(b)(2)(A) provides for the detention "of an alien who is *an applicant for admission*, if the examining immigration officer determines that *an alien seeking admission* is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). The INA defines an "applicant for admission" as "[a]n alien present in the United States who has not been admitted or who arrives in the United States" *See id.* § 1225(a)(1). The INA further defines "admission" and "admitted" as "the lawful entry of the alien into the

United States after inspection and authorization by an immigration officer." *See id.* § 1101(a)(13). The word "entry," is not defined in the INA, s*ee generally id.* § 1101, but the dictionary definition of "entry" is "the right or privilege of entering" or "the act of entering." *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/entry (last visited Dec. 10, 2025). "Entry" has long been understood to mean "a crossing into the territorial limits of the United States." *Hing Sum v. Holder*, 602 F.3d 1092, 1100–01 (9th Cir. 2010) (quoting *Matter of Pierre*, 14 I&N Dec. 467, 468 (BIA 1973)). Further, the phrase "seeking admission" is also undefined in the statute. The dictionary definition of "seeking" is "ask[ing] for," *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/seeking (last visited Dec. 10, 2025), and the word "seeking" "necessarily implies some sort of present-tense action." *Martinez v. Hyde*, 792 F. Supp. 3d 211, 218 (D. Mass. July 24, 2025) (citations omitted).

Respondents argue that any noncitizen who has not been lawfully admitted, regardless of whether they are already present and residing in the United States, is "an alien seeking admission" subject to mandatory detention under § 1225. However, that reading of § 1225 would render the qualifier "seeking admission" in the statute entirely unnecessary. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citations omitted). Given Congress's decision to use different terms in § 1225—i.e., "applicant for admission" and "alien seeking admission"—the Court will presume that Congress intended these phrases to mean different things. *See Pulsifer v. United States*, 144 S. Ct. 718, 735 (2024) ("In a given statute, . . . different terms usually have different meanings." (citation omitted)).

17

Here, Petitioner is not actively seeking to lawfully cross into the territorial limits of the United States because he already *entered* the United States over two years ago, in July of 2023. (*See* Notice to Appear, ECF No. 3-2, PageID.55.) As the United States District Court for the Southern District of New York explained when addressing this issue:

> [S]omeone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as "seeking admission" to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as "seeking admission" (or "seeking" "lawful entry") at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there. As § 1225(b)(2)(A) applies only to those noncitizens who are actively "seeking admission" to the United States, it cannot, according to its ordinary meaning, apply to [the petitioner], because he has already been residing in the United States for several years.

*Lopez Benitez v. Francis*, No. 25 Civ. 5937 (DEH), 2025 WL 2371588, at *7 (S.D.N.Y. Aug. 13, 2025); *see Lopez-Campos v. Raycraft*, No. 2:25-cv-12486, 2025 WL 2496379, at *6 (E.D. Mich. Aug. 29, 2025) ("[S]eeking admission' . . . implies action – something that is currently occurring, and in this instance, would most logically occur at the border upon inspection.").

In comparison to § 1225, "[s]ection 1226(a) is less specific." *Pizarro Reyes v. Raycraft*, No. 25-cv-12546, 2025 WL 2609425, at *4 (E.D. Mich. Sep. 9, 2025). Section 1226 provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." *See* 8 U.S.C. § 1226(a). Looking at both § 1225 and § 1226, even if the statutory text appears unambiguous when viewed in isolation, "courts are to interpret the words of a statute in context." *Hibbs*, 542 U.S. at 101 (citation omitted); *see Yates v. United States*, 574 U.S. 528, 537 (2015) ("The plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole." (alterations in original) (citations omitted)).

18

Section 1225 is titled: "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." 8 U.S.C. § 1225. A title such as this "is especially valuable [where] it reinforces what the text's nouns and verbs independently suggest." *Yates*, 574 U.S. at 552 (Alito, J., concurring). Additionally, Congress's decision to include the word "arriving," as well as the decision to include references to methods of physical arrival, such as "stowaways" and "crewmen," in § 1225 evidences an intent to address noncitizens arriving "at a border or port of entry." *Pizarro Reyes*, 2025 WL 2609425, at *5; 8 U.S.C. § 1225(a)(2)(3). In contrast, § 1226 is titled: "Apprehension and detention of aliens." 8 U.S.C. § 1226. "That Congress separated removal of arriving aliens[, as set forth in § 1225,] from its more general section for 'Apprehension and detention of aliens,' [as set forth in] § 1226, implies that Congress enacted § 1225 for a specific, limited purpose." *Pizarro Reyes*, 2025 WL 2609425, at *5 (citing *Dubin v. United States*, 143 S. Ct. 1557, 1567–68 (2023)).

Further, in *Jennings v. Rodriguez*, 583 U.S. 281 (2018), the United States Supreme Court explained that § 1225 is part of the "process of decision [that] generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible." *Jennings*, 583 U.S. at 287. The United States Supreme Court stated that, in contrast, "[s]ection 1226 generally governs the process of arresting and detaining . . . aliens [already living within the United States] pending their removal." *Id.* at 288. Thus, in *Jennings*, the United States Supreme Court differentiated between noncitizens initially arriving to the United States who are governed by § 1225, and noncitizens already present in the country who are governed by § 1226. *See id.* at 288–89.

The broader language of the statute, as recently amended, further supports the Court's conclusion. Recently, Congress passed the Laken Riley Act, which amended § 1226 to prescribe

19

a subset of noncitizens who are exempt from the discretionary bond analysis. Specifically, the Act added a subsection that explicitly mandates detention for those noncitizens who are inadmissible under §§ 1182(a)(6)(A), 1182(a)(6)(C), and 1182(a)(7), *and* who have been arrested for, charged with, or convicted of certain crimes. *See* 8 U.S.C. § 1226(c)(1)(E). If the Court accepted Respondents' interpretation of §§ 1225 and 1226, then § 1226(c)(1)(E) would be rendered entirely superfluous. *See Hibbs*, 542 U.S. at 101 ("[W]e follow the cardinal rule that statutory language must be read in context [since] a phrase gathers meaning from the words around it. . . . [And,] [t]he rule against superfluities complements the principle that courts are to interpret the words of a statute in context." (internal quotation marks omitted) (citation omitted)).

Accordingly, for the above-discussed reasons, the Court concludes that § 1226(a), not § 1225(b)(2)(A), governs noncitizens, such as Petitioner, who have resided in the United States and were already within the United States when apprehended and arrested.[4]

## C.    Fifth Amendment Due Process Considerations

Petitioner also argues that his detention violates the Fifth Amendment's Due Process Clause. (*See* Am. Pet., ECF No. 1, PageID.48–51.) Respondents counter Petitioner's arguments, arguing that Petitioner is entitled to no further process at this time because:

---

[4] The Court has recently reached the same conclusion in a number of other habeas corpus actions filed by immigration detainees. *See, e.g.*, *Salgado Mendoza v. Noem*, No. 1:25-cv-1252, 2025 WL 3077589, at *6 (W.D. Mich. Nov. 4, 2025); *Ruiz Mejia v. Noem*, No. 1:25-cv-1227, 2025 WL 3041827, at *5–6 (W.D. Mich. Oct. 31, 2025); *De Jesus Ramirez v. Noem*, No. 1:25-cv-1261, 2025 WL 3039266, at *5 (W.D. Mich. Oct. 31, 2025); *Escobar-Ruiz v. Raycraft*, No. 1:25-cv-1232, 2025 WL 3039255, at *5 (W.D. Mich. Oct. 31, 2025); *Marin Garcia v. Noem*, No. 1:25-cv-1271, 2025 WL 3017200, at *5 (W.D. Mich. Oct. 29, 2025); *Cervantes Rodriguez v. Noem*, No. 1:25-cv-1196, 2025 WL 3022212, at *6 (W.D. Mich. Oct. 29, 2025); *Puerto-Hernandez v. Lynch*, No. 1:25-cv-1097, 2025 WL 3012033, at *9 (W.D. Mich. Oct. 28, 2025); *Rodriguez Carmona v. Noem*, No. 1:25-cv-1131, 2025 WL 2992222, at *6 (W.D. Mich. Oct. 24, 2025); *Sanchez Alvarez v. Noem*, No. 1:25-cv-1090, 2025 WL 2942648, at *6 (W.D. Mich. Oct. 17, 2025). And, this Court is far from the first federal District Court to reach this conclusion.

> Petitioner has received notice of the charges against him, has access to counsel, has had two credible fear interviews, is scheduled to attend hearings with an immigration judge, may request bond, has the right to appeal the denial of any request for bond, and has been detained by ICE for less than three months.

(Resp., ECF No. 5, PageID.83.

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the very liberty that [the Due Process Clause] protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (citation omitted). The Fifth Amendment's Due Process Clause extends to all persons, regardless of status. *See A. A. R. P. v. Trump*, 145 S. Ct. 1364, 1367 (2025). Thus, noncitizens, such as Petitioner, are entitled to its protections. *See id.*; *see also Chavez-Acosta v. Garland*, No. 22-3045, 2023 WL 246837, at *3 (6th Cir. Jan. 18. 2023).

Respondents contend that Petitioner is entitled to no further process at this time. (*See* Resp. ECF No. 5, PageID.83.) Respondents' assertion, however, is contradicted by their own supporting evidence—there is nothing in the record before the Court to suggest that a bond hearing has been scheduled. Respondents claim further "that statutory provisions denying bond during administrative removal proceedings do not violate the [D]ue [P]rocess [C]lause." (*Id.*, PageID.82 (citation omitted).)

If the Court agreed with Respondents that Petitioner's detention is governed by § 1225(b)(2)(A), then the Government's due process argument might carry more weight. However, as set forth above, this Court does not agree with Respondents that Petitioner's detention is governed by § 1225(b)(2)(A). Instead, Petitioner's detention is governed by § 1226(a). Section 1226(a) clearly sets forth a discretionary framework for detention or release of an alien subject to that provision. The statute allows the Attorney General to continue to detain the arrested alien, or release the alien on "bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General," or "conditional parole." *See* 8 U.S.C.

§ 1226(a)(1)–(2). This discretionary framework "requires a bond hearing to make an individualized custody determination." *See Lopez-Campos*, 2025 WL 2496379, at *9.

The Sixth Circuit held that the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), regarding the adequacy of process, applies in the context of immigration detention. *See, e.g.*, *United States v. Silvestre-Gregorio*, 983 F.3d 848, 852–56 (6th Cir. 2020) ("If this court has previously addressed the due-process claim, then we are bound by precedent; if the claim is an issue of first impression, then we generally apply the three-factor test the Supreme Court set out in *Mathews v. Eldridge*."). Under *Mathews*, the Court must consider the following three factors: "(1) the private interest that will be affected by official action; (2) the risk of erroneous deprivation of that interest; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedures entail." *See Lopez-Campos*, 2025 WL 2496379, at *9 (citing *Mathews*, 424 U.S. at 335).

The first *Mathews* factor clearly weighs in favor of Petitioner. There is no dispute that Petitioner has a significant private interest in avoiding detention, as one of the "most elemental of liberty interests" is to be free from detention. *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (citation omitted). The Court may also consider Petitioner's conditions of confinement, i.e., "whether a detainee is held in conditions indistinguishable from criminal incarceration." *See Günaydin v. Trump*, 784 F. Supp. 3d 1175, 1187 (D. Minn. 2025) (citing *Hernandez-Lara v. Lyons*, 10 F.4th 19, 28 (1st Cir. 2021); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020)). Here, Petitioner, through counsel, represents that Petitioner was previously issued an I-766, Employment Authorization Document, which is "valid from March 30, 2024[,] through March 29, 2029." (Am. Pet., ECF No. 3, PageID.34.) Petitioner further represents that he "has complied with everything required of him by the Government since his initial entry and conditional parole into the United

States." (*Id.*, PageID.35.) Petitioner avers further that after his release by USBP agents, he "relocated to New York initially, and then to Detroit, where he has been living and legally working." (*Id.*, PageID.48.) There can be no doubt that he is "experiencing [many of] the deprivations of incarceration, including loss of contact with friends and family, loss of income earning, . . . lack of privacy, and, most fundamentally, the lack of freedom of movement." *See Günaydin*, 784 F. Supp. 3d at 1187.

The second *Mathews* factor also weighs in Petitioner's favor. An individualized bond hearing ensures that an immigration judge can assess whether Petitioner poses a flight risk or a danger to the community, reducing the risk that Petitioner will suffer an "erroneous deprivation" of his rights. *See Lopez-Campos*, 2025 WL 2496379, at *9.

Finally, under the third *Mathews* factor, the Court recognizes that the Government "does, indeed, have a legitimate interest in ensuring noncitizens' appearance at removal proceedings and preventing harms to the community." *See Sampiao v. Hyde*, No. 1:25-cv-11981-JEK, 2025 WL 2607924, at *12 (D. Mass. Sep. 9, 2025) (citation omitted). However, Respondents have not established a significant interest in "detaining someone who [could convince] a neutral adjudicator, following a hearing and assessment of the evidence, that his ongoing detention is not warranted." *See id.* Furthermore, Respondents have not established that an individualized hearing would impose significant "administrative or financial costs" in this case—"[t]o the contrary," Respondents' position "requires the government to continue funding and overseeing [Petitioner's] detention[.]" *See id.*

In sum, the Court's balancing of the *Mathews* factors weighs in Petitioner's favor. Accordingly, the Court concludes that Petitioner's current detention under the mandatory detention framework set forth in § 1225(b)(2)(A) violates Petitioner's Fifth Amendment due process rights.

## V.    Proper Respondents

Respondents argue that the Detroit ICE Field Office Director is the only proper Respondent in this action, and they seek the dismissal of all of the other named Respondents. (Resp., ECF No. 5, PageID.84–85.)

"The writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody." *Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 494–95 (1973). Thus,

> [r]ead literally, the language of § 2241(a) requires nothing more than that the court issuing the writ have jurisdiction over the custodian. So long as the custodian can be reached by service of process, the court can issue a writ "within its jurisdiction" requiring that the prisoner be brought before the court for a hearing on his claim, or requiring that he be released outright from custody, even if the prisoner himself is confined outside the court's territorial jurisdiction.

*Id.* at 495.

The Sixth Circuit has concluded "that a detained alien generally must designate his immediate custodian—the [Immigration and Naturalization Service (INS), the predecessor to the present immigration-related agencies,] District Director for the district where he is being detained—as the respondent to his habeas corpus petition." *Roman v. Ashcroft*, 340 F.3d 314, 322 (6th Cir. 2003). Here, Petitioner has named the Director of the Detroit Field Office of ICE, the Acting Director of ICE, and the United States Secretary of Homeland Security as Respondents. (Am. Pet., ECF No. 1, PageID.33, 41.)

In *Roman v. Ashcroft*, the Sixth Circuit stated that although it "conclude[d] that the immediate custodian rule generally applies to alien habeas corpus petitioners, . . . [there is] the possibility of exceptions to this rule." *Roman*, 340 F.3d at 322. The *Roman* court explained:

> Some courts are also willing to make an exception to the immediate custodian rule in other extraordinary circumstances. For example, courts have noted the INS's ability, as a practical matter, to deny aliens any meaningful opportunity to seek habeas corpus relief simply by transferring aliens to another district any time they

24

filed a habeas corpus petition. *Chavez–Rivas*[ *v. Olsen*], 194 F. Supp. 2d [368,] 374 [(D.N.J. 2002)]. Aliens remaining in detention for extended periods are often transferred several times during their detention. *See Lee v. Ashcroft*, 216 F. Supp. 2d 51, 55 (E.D.N.Y. 2002) ("[T]he location of custody, and the identity of the day-to-day custodian, frequently change when detainees are transferred among INS facilities, all of which are under the control of the Attorney General."); . . . . In light of these transfers, one court reasoned that an alien may properly name a respondent other than his immediate custodian because a petition naming a higher level official, such as the Attorney General, could be adjudicated without interruption in the event of a transfer. *Arias–Agramonte*[ *v. Comm'r*], [No. 00 CIV. 2412 (RWS),] 2000 WL 1617999, at *8 [(S.D.N.Y. Oct. 30, 2000)] (explaining that a petition naming only one's immediate custodian would be dismissed when the alien was transferred to another local district).

*Id.* at 325–26. Thus, the Sixth Circuit concluded, "an exception might be appropriate if the INS were to exercise its transfer power in a clear effort to evade an alien's habeas petitions." *Id.* at 326.

In light of the foregoing, to ensure that Respondents maintain authority to enforce this Court's conditional grant of habeas relief—i.e., the Court's directive that Petitioner receive a bond hearing or, alternatively, be released—in the event that Petitioner is transferred out of the Western District of Michigan, the Court will not dismiss Secretary Noem as a Respondent to these proceedings.

### Conclusion

For the reasons discussed above, the Court will enter a Judgment conditionally granting Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (ECF No. 1.) The Court will order Respondents to provide Petitioner with a bond hearing under 8 U.S.C. § 1226(a) within five business days of the date of this Court's Opinion and Judgment or, in the alternative, immediately release Petitioner from custody.[5] The Court will also order Respondents to file a status

---

[5] Although Petitioner only requests that the Court order Respondents to immediately release him from custody, this Court has adopted a standard practice of directing that detainees subject to 8 U.S.C. § 1226(a) be provided a bond hearing within five business days or, alternatively, be released.

report within six business days of the date of this Court's Opinion and Judgment to certify compliance with this Opinion and the corresponding Judgment. The status report shall include if and when the bond hearing occurred, if bond was granted or denied, and if bond was granted, the conditions of the bond, or if bond was denied, the reasons for the denial.


Dated:    December 15, 2025                        /s/ Jane M. Beckering
                                                  Jane M. Beckering
                                                  United States District Judge